Robert JOHNSTONE, derivatively on behalf of National Income Realty Trust, a California business trust, and John Pedjoe, derivatively on behalf of Transcontinental Realty Investors, Inc., a Nevada Corporation, Plaintiffs,

v.

FIRST BANK SYSTEM, INC., a bank holding company; First Bank National Association, a national banking association; a national banking association; First Bank (N.A.), a business entity; and FBS Business Finance Corporation, a business entity; and David J. Wabick, an individual, Defendants,

and

National Income Realty Trust, a California business trust; and Transcontinental Realty Investors, Inc., a Nevada Corporation, Nominal Defendants.

No. 95 C 2008.

United States District Court, N.D. Illinois, Eastern Division.

Nov. 21, 1996.

Jack L. Block, Lowell E. Sachnoff, Angela Youngsun Im, Sachnoff & Weaver, Ltd., Chicago, IL, Daniel B. Harris, George Donaldson, San Francisco, CA, for Robert Johnstone, John Pedjoe.

Michael B. Weininger, Lawrence Michael Karlin, Katz, Randall & Weinberg, Chicago, IL, Roger J. Magnuson, Todd C. Pearson, Brian E. Palmer, Dorsey & Whitney, Minneapolis, MN, for First Bank System, First Bank Nat'l Assn., FBS Business Finance Corp.

Barry J. Freeman, Highland Park, IL, for David J. Wabick.

## MEMORANDUM OPINION AND ORDER

ANN CLAIRE WILLIAMS, District Judge.

Plaintiffs Robert Johnstone, on behalf of National Income Realty Trust ("NIRT"), and John Pedjoe, on behalf of Transcontinental Realty Investors, Inc. ("TCI"), bring this action against Defendants, First Bank System, Inc., First Bank National Association, First Bank, and FBS Business Finance Corporation ("FBS Entities") and David J. Wabick alleging violations of the anti-tying provisions of the Bank Holding Company Act ("BHCA"), 12 U.S.C. § 1972, (Count I) and various state-law claims (Counts II–IV).

The FBS Entities move this court to dismiss the First Amended Verified Derivative Complaint ("amended complaint") for failure to state a claim upon which relief may be granted. See Fed.R.Civ.P. 12(b)(6). In the alternative, the FBS Entities move for dismissal of Counts II–IV for failure to satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

## Background

For purposes of this motion, all well-pleaded facts in the amended complaint are taken as true. *ITC Financial Services, Ltd. v. Interstate Bank of Oak Forest,* 93 C 3799, 1993 WL 469926, *2 (N.D.Ill. Nov.10, 1993) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

By the Fall of 1991, Gene E. Phillips ("Phillips") and William S. Friedman ("Friedman"), who managed and controlled NIRT and TRI ("the Trusts") directly or indirectly, were facing severe financial demands. American Realty Trust ("ART"), then the largest shareholder of the Trusts and two sister trusts controlled by Phillips and Friedman, was facing financial crisis of monumental dimension. ART was being pressured by First City, its main lender, to repay approximately $30 million it had borrowed under a line of credit. Other Phillips–Friedman affiliates also owed millions of dollars to First City.

Also by the Fall of 1991. Milwaukee developer Frank P. Crivello's organization was in a severe financial crisis. It had begun to experience severe cash shortages. By late 1991, more than 30 foreclosure suits had been commenced against Crivello or related entities and more than 100 other lawsuits were commenced against them by unpaid subcontractors and other creditors. Am. Compl. at ¶ 20. First Bank held notes that were due from the Crivello organization. Am. Compl. at ¶ 26. First Bank then assigned the notes to David Wabick ("Wabick"). Am. Compl. at ¶ 28.

On December 13, 1991, the Trusts purchased eleven properties from the Crivello organization. The total purchase price was approximately $21 million, which included the payment of $11 million and the assumption by the Trusts of about $10 million in existing debt on the properties. Am. Compl. at ¶ 27. The $11 million paid in cash was paid as follows: (a) NIRT purchased "at face value" from David Wabick, who was then both a First Bank assignee and a partner of Phillips and Friedman, about $6.6 million in obligations owed by Crivello entities to each of the First Bank defendants (the "Notes"); and (b) NIRT and TCI paid the remaining

amount, i.e. about $4.3 million, in cash to the sellers. Am. Compl. at ¶ 28. At this time TCI did not have the funds necessary to participate in the December 1991 property purchase. Simultaneously, First Bank loaned $3.5 million to a wholly-owned subsidiary of TCI, South Cochran. This loan, separately guaranteed by TCI, was then used in part to allow TCI to engage in the note purchase/loan transaction. Am. Compl. at ¶ 35. The properties acquired by NIRT and TCI in connection with the December 13, 1991 transaction were distressed and overvalued. Am. Compl. at ¶ 30.

On or about Monday December 16, 1991, as a quid pro quo for the benefits FBNA received in connection with the December 13 property purchases, FBNA made loans totalling approximately $30 million to three Illinois limited partnerships formed by Wabick and owned and controlled by Phillips and Friedman. The loans were made on the condition or requirement that the Trusts, directly or indirectly, purchase the defaulted Crivello notes. Am. Compl. at ¶ 40.

The proceeds from the loans by First Bank to the Illinois partnerships were eventually used in substantial part to help Phillips' and Friedman's affiliates, mainly ART. pay off their obligations to First City. Am. Compl. at ¶ 43.

Finally, in February 1992, TCI paid $1.3 million for three Crivello notes held by FB and secured by two buildings and land. Am. Compl. at ¶ 45. The purchase of these three notes was linked to the December 1991 transactions. Am. Compl. at ¶ 46.

### Motion to Dismiss

■ A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1406 (N.D.Ill. 1996) (citing *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990)); Therefore, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990); *Colfax Corp. v. Illinois State Toll Highway Auth.*, 79 F.3d 631, 632 (7th Cir.1996) (citation omit-

ted). The court will dismiss a claim only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief." *Colfax*, 79 F.3d at 632 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

### *Discussion*

### I. Bank Holding Company Act

In Count I, plaintiffs allege that defendants violated the anti-tying provisions of the Bank Holding Company Act; 12 U.S.C. § 1971, et seq. Plaintiffs, on behalf of the Trusts, contend that defendants violated the bank act by conditioning the extension of credit to three Illinois partnerships owned and controlled by Phillips, Friedman, and Wabick, on the Trusts, affiliates of Phillips, Friedman, the Illinois partnerships, and Wabick, purchasing approximately $6.6 million in defaulted notes held by FBS. Defendants respond that plaintiffs' claim fails because plaintiffs have not alleged a tying transaction, they lacked standing, and they have not alleged an antitrust injury.

■ According to the Bank Holding Company Act, 12 U.S.C. § 1971(1), which provides, in relevant part, that:

[a] bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—that the customer shall obtain some additional credit, property, or service from such bank, bank holding company, or subsidiary of such bank holding company. 12 U.S.C. section 1972(1)(A) and (B).

Therefore, a threshold issue is whether defendants are "banks" and plaintiffs are "customers" within the meaning of the BHCA. According to the amended complaint, defendants FBNA and FB are "banks" within the meaning of the antitying provisions. FBNA, FB, and FBS are and were subsidiaries of FBSI, a "bank holding company" within the meaning of the antitying provisions. (Am. Compl. at ¶ 53.)

Next, the court must determine whether the plaintiffs qualify as "customers" within the meaning of the BHCA with standing to bring this claim. Courts have found that, in general, when "there has been a direct relationship between the bank and purported customer, as well as privity of contract with the bank, it is reasonable to conclude that a customer relationship exists." *Swerdloff v. Miami National Bank*, 584 F.2d 54, 59 (5th Cir.1978); *Amerifirst Properties, Inc. v. Federal Deposit Insurance Corp.*, 880 F.2d 821, 825–26 (5th Cir.1989). However, when the relationship is not so clear, the *Swerdloff* court recommends that courts consider the economic realities of ownership and control to determine who is a customer within the meaning of the Act. *Swerdloff*, 584 F.2d at 58. In that case, two 100% shareholders of a corporation were required to guarantee the defendant-bank's loan to the corporation. Looking to the economic realities of ownership and control, the court held that the owners must be considered just as much "customers" of the bank as the corporation through which they do business for the purposes of these provisions of the Bank Holding Company Act. *Id.* at 59. In addition, the Seventh Circuit, interpreting *Swerdloff*, says that no unyielding rule confines recovery under the bank tying laws to the bank's customer. *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1336 (7th Cir.1989).

Therefore, because the parameters of the term "customer" are not clearly defined in the BHCA and both the *Swerdloff* and *Mid–State* courts have not confined its meaning, the court will similarly apply a broad reading to the facts in the present case. The court finds that the Trusts qualify as customers of First Bank because (1) they purchased the notes from First Bank, through Wabick and (2) related intermediaries of the Trusts were involved in the extension of credit arm of the transaction.

Having addressed this threshold issue, the court must now determine whether the amended complaint, on its face, satisfies the pleading requirements under the BHCA's tying provisions. In order to state a

claim under the tying provisions, plaintiffs must plead that defendants' actions: (1) were unusual in the banking industry; (2) constituted an anti-competitive tying arrangement; and (3) benefited the bank. *ITC Financial Services, Ltd. v. Interstate Bank of Oak Forest*, 93 C 3799, 1993 WL 469926, *2 (N.D.Ill. Nov. 10, 1993); *See Graue Mill Development Corporation v. Colonial Bank & Trust Company of Chicago*, 88 C 2584, 1990 WL 6823 (N.D.Ill.1990), *aff'd*, 927 F.2d 988 (1991); *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 87 C 1078, 1987 WL 12909, *2 (N.D.Ill. June 19, 1987).

Plaintiffs first must allege that FBS' actions were unusual in the banking industry. In *ITC Financial Services, Ltd.*, ITC alleged that the defendant's demand that ITC repay money owed on a separate unrelated loan was unusual in the banking industry. *ITC Financial Services, Ltd.*, 93 C 3799, 1993 WL 469926, *2. The defendant countered that this allegation was "conclusory and without basis in fact." *Id.* The court, however, held that any factual issues may not be addressed on a motion to dismiss and therefore that ITC sufficiently pleads that defendant's actions were unusual. *Id.*

Similarly, in the amended complaint, plaintiffs describe the alleged tying arrangement as unusual in the banking industry. (Am. Compl. at ¶ 53.) It appears that plaintiffs want the court to conclude that the allegation of unusual banking practice is obvious on the face of the complaint based on the facts they have set forth. Unlike the defendants in *ITC Financial Services, Ltd.*, defendants, in the present case, do not address the alleged unusual nature of their actions in their motion to dismiss. Even though plaintiffs' allegations might appear more conclusory than factual, the factual issues may not be addressed on a motion to dismiss. Therefore, as in *ITC Financial Services, Ltd.*, this court finds that plaintiffs have sufficiently plead that defendants' actions were unusual.

Next, plaintiffs must allege that defendants' actions constituted an anticompetitive tying arrangement.[1] Plaintiffs,

---

1. The antitrust laws are a response to tie-ins and reciprocity agreements that enable a party with

therefore, must plead that the alleged arrangement was a "tie-in" and that it was anticompetitive. The Seventh Circuit defines a "tie-in" as "an arrangement by one party to sell one product (the tying product), but only on the condition that the buyer also purchase a different ... product (the tied product), or at least agree that he will not purchase that product from another supplier." *Davis v. First National Bank of Westville,* 868 F.2d 206, 208 (7th Cir.) (quoting *Northern Pacific Railway v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)), *cert. denied,* 493 U.S. 816, 110 S.Ct. 68 107 L.Ed.2d 35 (1989). In the amended complaint, plaintiffs allege the following:

> as a condition for making the approximately $30 million in loans to the three Illinois partnerships owned and/or controlled by Phillips, Friedman and Wabick, FBNA required the Trusts, which at the time of the quid pro quo transactions were affiliates not only of Phillips and Friedman but of the Illinois partnership and Wabick, to purchase approximately $6.6 million in defaulted Crivello indebtedness (i.e., the "Notes") held by FBNA, FB, and FBS. Am. Compl. at ¶ 52.

The court finds that the plaintiffs have sufficiently plead a tie-in.

However, now the court must determine whether plaintiffs complained of its anti-competitive effect. Courts have granted motions to dismiss when the plaintiff failed to allege a practice that is anti-competitive in the complaint. *See Graue Mill Development Corporation v. Colonial Bank & Trust Company of Chicago,* 88 C 2584, 1990 WL 6823, *3; *Davis,* 868 F.2d at 208–09; *Exchange National Bank of Chicago v. Daniels,* 768 F.2d 140, 143–44 (7th Cir.1985); *Palermo v. First National Bank and Trust Company of Oklahoma City,* 894 F.2d 363, 368 (10th Cir. 1990). Although plaintiffs do discuss the anticompetitive nature of the arrangement in their response brief, plaintiffs have failed to plead the anti-competitive nature of the arrangement in the amended complaint. However, in deciding a motion to dismiss, the

court is limited to the pleadings. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Tibor Machine Products, Inc. v. Freudenberg–Nok General Partnership,* 94 C 7635, 1996 WL 535338, *8 n. 2 (N.D.Ill. Sept. 19, 1996) (citing *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)); *See S Industries, Inc. v. GMI Holdings, Inc.,* 96 C 2232, 1996 WL 526792, *4 (N.D.Ill. Sept. 12, 1996) (citation omitted); *Schoenhorn v. City of Chicago,* 95 C 3677, 1996 WL 521398, *12 (N.D.Ill. Sept. 11, 1996) (citation omitted).

Therefore, even though this court construes the term "customer" in its broadest sense and finds that the Trusts and its affiliates qualify as a customer of FB and that the arrangement was a tie-in within the meaning of the BHCA, plaintiffs have failed to plead the anti-competitive nature of the arrangement in the Amended Complaint and for this reason fails to state a claim under the BHCA. Defendants motion to dismiss is granted as to this count.

## II. State Law Conspiracy Claims

In diversity cases, federal courts apply the choice of law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Illinois choice of law rules provide that the law of the state with the most significant relationship with the events giving rise to the litigation shall apply. *Malatesta v. Mitsubishi Aircraft International, Inc.,* 275 Ill.App.3d 370, 211 Ill.Dec. 710, 716, 655 N.E.2d 1093, 1099 (1995) (citing *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593, 596 (1970)). In this case, Minnesota and Wisconsin have the most significant relationships with the events giving rise to this litigation. The closings on the sales of the Crivello notes occurred in Milwaukee, Wisconsin, and the closings on the real estate loans occurred in Minneapolis, Minnesota.

---

sufficient power in one market to avoid the standard market criteria of price, quality, and service in another market and thereby lessen competition. *Davis,* 868 F.2d at 208.

In general, under Wisconsin law,[2] for a conspiracy to exist, there must be, at a minimum "facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Bartley v. Thompson,* 198 Wis.2d 323, 542 N.W.2d 227, 235 (1995) (quoting *Augustine v. Anti–Defamation League of B'nai B'rith,* 75 Wis.2d 207, 249 N.W.2d 547, 552 (1977)), *cert. denied,* —— U.S. ——, 116 S.Ct. 1829, 134 L.Ed.2d 934 (1996); *See also Anderson v. Regents of the University of California,* 203 Wis.2d 469, 554 N.W.2d 509, 518 (1996) (quoting *Cranston v. Bluhm,* 33 Wis.2d 192, 147 N.W.2d 337, 340 (1967) ("Wisconsin defines a civil conspiracy as 'a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful' ")).

Under Wisconsin law, to state a cause of action for civil conspiracy, the complaint must set forth "the formation and operation of the conspiracy, the wrongful act or acts done pursuant to the conspiracy and the resultant damage from such acts." *Anderson,* 554 N.W.2d at 518 (citing *Onderdonk v. Lamb,* 79 Wis.2d 241, 255 N.W.2d 507, 510 (1977)). Even with liberal notice pleading, a plaintiff's "general allegation of conspiracy, without a statement of the facts constituting that conspiracy is only an allegation of a legal conclusion and is insufficient to constitute a cause of action." *Bartley,* 542 N.W.2d at 235 (quoting *McCleneghan v. Union Stock Yards Co.,* 298 F.2d 659, 663 (8th Cir.1962)).

The issue before the court is whether the plaintiffs have set forth (1) the formation and operation of the conspiracy, (2) the wrongful acts done, and (3) the resulting damage.

### A. Conspiracy to Breach Fiduciary Duties

For its claim for conspiracy to breach fiduciary duties, plaintiffs do allege that defen-

dants formed and operated a conspiracy. Plaintiffs allege that FB and Wabick acting with knowledge that the conduct of Phillips and Friedman represented self-dealing and other breaches of fiduciary duty entered into a conspiracy and agreement or agreements to further the wrongful conduct of Phillips and Friedman. Am. Compl. at ¶ 62.

Plaintiffs then allege the wrongful acts done. FB accepted approximately $6.6. million of trust assets which were transferred to it at the direction of Phillips and Friedman, as a quid pro quo and condition for FBNA's agreement to provide and to provide loans totalling almost $30 million to several private partnerships owned and/or controlled by Phillips and Friedman. Am. Compl. at ¶ 62.

Finally, plaintiffs complain that as a result of these acts, the Trusts suffered damages. Am. Compl. at ¶ 64.

### B. Conspiracy to Defraud

For the conspiracy to defraud claim, plaintiffs allege that defendants formed a conspiracy, as discussed above. In addition to the facts detailed above, the plaintiffs claim that each of the defendants actively made and participated in the making of the following false and misleading statements or omissions of material fact: The defendants failed to disclose the true purpose and intent of (1) the December 1991 quid pro quo transactions; (2) the relationship between the Trusts' December 1991 property purchases and the approximately $30 million in loans extended by FBNA to Phillips and Friedman's affiliates; and (3) the creation of corporate records describing the quid pro quo transactions as ordinary commercial transactions when they were not. Am. Compl. at ¶ 69. Plaintiffs further allege that these acts and representations were all false and made in furtherance of an agreement between the defendants and Phillips and Friedman to obtain trust assets as a quid pro quo for FBNA's agreement to provide $30 million in loans to private affiliates of Phillips and Friedman. Am. Compl. at ¶ 70.

---

**2.** There are no substantive differences between Minnesota and Wisconsin law with respect to the relevant issues.

As a result of this conduct, plaintiffs claim they have suffered damages and pray for relief. Am. Compl. at ¶ 73.

### C. Conspiracy to Convert and Misappropriate Assets

Finally, for its conspiracy to convert and misappropriate assets claim, plaintiffs allege that defendants formed a conspiracy to convert, misappropriate, and divert assets of the trusts. Defendants rendered substantial assistance to the conversion and misappropriation of the assets of the trusts. Am. Compl. at 77. As a result, plaintiffs claim they suffered damages. Am. Compl. at 79.

### D. Federal Rule of Civil Procedure 9(b)

Alternatively, defendants move the court to dismiss these state law claims for failure to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). Federal Rule of Civil Procedure 9(b) requires that "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). However, "Rule 9(b) does not require an exhaustively detailed explanation of the circumstances of the fraud; the plaintiff should set forth the time, place, and substance of the allegedly false representations, as well as the identity of the individual making representations. The allegations are sufficient if the defendant is in a position to understand the nature of the conduct from which the plaintiff has drawn the inference of fraud and can defend against the allegations." *Tibor Machine Products, Inc.*, 94 C 7635, 1996 WL 535338, *6. The court finds that the above allegations sufficiently inform defendants about the nature of the conduct from which plaintiffs base their conspiracy allegations.

Therefore, the court finds that plaintiffs have adequately stated claims for civil conspiracy in compliance with both Federal Rules of Civil Procedure 12(b)(6) and 9(b) and deny defendants' motion to dismiss as to Counts II–IV.

### Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted as to Count I and denied as to Counts II–IV. Parties should discuss settlement before the next court date.